**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**OCALA DIVISION**

| | |
|---|---|
| Sandra Adams, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Class Action Complaint |
| - against - | Jury Trial Demanded |
| The Kraft Heinz Company, | |
| Defendant. | |

Plaintiff alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge:

1.    Kraft Heinz Food Company ("Defendant") manufactures, labels, markets, and sells concentrated flavored liquids that purport to taste like various fruits under the MiO brand of water enhancers (the "Products").



## I.     CONSUMER DEMAND FOR NATURAL FLAVOR

2.     Consumers are increasingly concerned about the ingredients added to what they eat and drink.

3.     Surveys have shown that consumers are less likely to buy beverages which have artificial ingredients.

4.     Within the spectrum of artificial ingredients, consumers increasingly strive to avoid artificial flavoring ingredients and seek to consume products with only natural flavors.

5.     As reported by the Wall Street Journal, "As consumer concern rises over artificial ingredients, more food companies are reconstructing recipes" to remove artificial flavors.[1]

6.     According to Paul Manning, chief executive officer and president of Sensient Technologies, "Consumer desire for naturally flavored products is an emerging trend."[2]

7.     A recent survey reported that over 82% of consumers believe that foods with artificial flavors are less healthy than those promoted as containing natural flavors and/or not containing artificial flavors.

8.     Consumers seek to avoid artificial flavors because they are weary of ingredients which are highly processed with chemical additives and synthetic solvents in laboratories.

9.     According to Nielsen, the absence of artificial flavors is very important for over 40% of respondents to their Global Health & Wellness Survey.

10.     One scholar theorized "the preference for natural products appeals to a moral

---

[1] Lauren Manning, How Big Food Is Using Natural Flavors to Win Consumer Favor, Wall Street Journal.
[2] Keith Nunes, Using Natural Ingredients To Create Authentic, Fresh Flavors, Food Business News, Sept. 20, 2018.

ideology and offers a moral satisfaction."[3]

11.    The trade journal, Perfumer & Flavorist, described "The Future of Artificial Flavors & Ingredients" as bleak, given consumer opposition to these synthetic ingredients.[4]

12.    Mintel announced that American consumers avoidance of artificial flavors is just as strong as their desire for natural flavors, in its Report, "Artificial: Public Enemy No. 1."[5]

13.    Nielsen reported that 62% of consumers try to avoid artificial flavors.

14.    New Hope Network concluded that 71% of consumers avoid artificial flavors.

15.    Label Insight determined that 76% of consumers avoid artificial flavors.

16.    As reported by Forbes, 88% of consumers consider foods without artificial flavors to be more natural and healthier than foods with artificial flavors and would pay more for such foods.

## II.    PRODUCTS REPRESENTED AS CONTAINING ONLY NATURAL FLAVORS

17.    Defendant markets and advertises the Products with the standalone representations "NATURAL FLAVOR WITH OTHER NATURAL FLAVOR."

---

[3] Rozin, P., Spranca, M., Krieger, Z., Neuhaus, R., Surillo, D., Swerdlin, A., & Wood, K. (2004). Preference for natural: Instrumental and ideational/moral motivations, and the contrast between foods and medicines. Appetite, 43(2), 147–154. doi:10.1016/j.appet.2004.03.005.
[4] Jim Kavanaugh, The Future of Artificial Flavors & Ingredients, Perfumer & Flavorist, June 12, 2017.
[5] Alex Smolokoff, Natural Color And Flavor Trends In Food And Beverage, Natural Products Insider, Oct. 11, 2019; Thea Bourianne, Exploring Today's Top Ingredient Trends And How They Fit Into Our Health-Conscious World, March 26-28, 2018; Nancy Gagliardi, Consumers Want Healthy Foods – And Will Pay More For Them, Forbes, Feb 18, 2015.

 

18.    The representations that the Products contain only "Natural Flavor With Other Natural Flavors" appeals to more than the seven out of ten consumers who seek to avoid artificial flavoring ingredients, as these synthetic ingredients are believed to be associated with detrimental health and environmental effects.[6]

19.    By promoting the Products as containing only "Natural Flavor With Other Natural Flavor," reasonable consumers are led to believe that the Products' flavoring and flavoring profile comes solely from natural ingredients.

20.    The Products, however, contain the artificial and/or synthetic flavoring ingredient "Malic Acid."

Berry Pomegranate

INGREDIENTS: WATER, CITRIC ACID, MALIC ACID, GUM ARABIC, POTASSIUM CITRATE, CONTAINS LESS THAN 2% OF NATURAL FLAVOR, SUCRALOSE AND ACESULFAME POTASSIUM (SWEETENERS), SUCROSE ACETATE ISOBUTYRATE, RED 40, BLUE 1, POTASSIUM SORBATE (PRESERVATIVE).

Tropical Cherry

INGREDIENTS: WATER, MALIC ACID, CITRIC ACID, NATURAL FLAVOR, CONTAINS LESS THAN 2% OF NIACINAMIDE (VITAMIN B3), VITAMIN B6, VITAMIN B12, STEVIA LEAF EXTRACT, SODIUM CITRATE, RED 40, BLUE 1, POTASSIUM SORBATE (PRESERVATIVE).

---

[6] Alex Smolokoff, Natural Color And Flavor Trends In Food And Beverage, Natural Products Insider, Oct. 11, 2019; Thea Bourianne, Exploring Today's Top Ingredient Trends And How They Fit Into Our Health-Conscious World, March 26-28, 2018; Nancy Gagliardi, Consumers Want Healthy Foods – And Will Pay More For Them, Forbes, Feb 18, 2015.

**INGREDIENTS:** WATER, CITRIC ACID, <mark>MALIC ACID</mark>, GUM ARABIC, POTASSIUM CITRATE, CONTAINS LESS THAN 2% OF <mark>NATURAL FLAVOR</mark>, SUCRALOSE AND ACESULFAME POTASSIUM (SWEETENERS), SUCROSE ACETATE ISOBUTYRATE, RED 40, BLUE 1, POTASSIUM SORBATE (PRESERVATIVE).

**INGREDIENTS:** WATER, <mark>MALIC ACID</mark>, CITRIC ACID, <mark>NATURAL FLAVOR</mark>, CONTAINS LESS THAN 2% OF NIACINAMIDE (VITAMIN B3), VITAMIN B6, VITAMIN B12, STEVIA LEAF EXTRACT, SODIUM CITRATE, RED 40, BLUE 1, POTASSIUM SORBATE (PRESERVATIVE).

21.    In fact, the Products contain more of the malic acid ingredient than the natural flavoring ingredients, listed as the third and second most predominant ingredients by weight.

22.    Unbeknownst to consumers, the ingredient list does not disclose that malic acid is an artificial petrochemical which provides flavoring to the Products.

23.    Federal and identical state regulations require ingredients to be designated by their specific name instead of their generic name. 21 C.F.R. § 101.4(b).

24.    Defendant only lists "Malic Acid," the generic name for this ingredient, even though its specific name is "DL-Malic Acid."

## III.    COMPONENTS OF TASTE

25.    A flavor is a substance the function of which is to impart taste. See 21 C.F.R. § 101.22(a)(1) and (3).

26.    Taste is the combination of sensations arising from specialized receptor cells located in the mouth.[7]

27.    Taste can be defined as sensations of sweet, sour, salty, bitter, and umami.

---

[7] Gary Reineccius, Flavor Chemistry and Technology § 1.2 (2d ed. 2005).

28.     However, limiting taste to five categories suggests that taste is simple, which is not true.

29.     For example, the taste of sour includes the sourness of vinegar (acetic acid), sour milk (lactic acid), lemons (citric acid), apples (malic acid), and wines (tartaric acid).

30.     Each of those acids is responsible for unique sensory characteristics of sourness.

31.     Fruit flavors are the sum of the interaction between sugars, acids, and volatile compounds.[8]

32.     Sugars, mainly glucose and fructose, and their ratio to acids, such as citric and malic acid, determine the sweetness of fruits.

33.     The table below shows the acid composition of numerous fruits.

| Fruit | Predominant Acid | Secondary Acids |
|---|---|---|
| Apple | Malic Acid (95%) | Tartaric Acid, Fumaric Acid |
| Apricot | Malic Acid (70%) | Citric Acid, Tartaric Acid |
| Blackberry | Citric Acid | Malic Acid |
| Blueberry | Citric Acid | Malic Acid, Quinic Acid |
| Cherry | Malic Acid (94%) | Tartaric Acid |
| Cherry (Tropical) | Malic Acid (32%) | Citric Acid |
| Grape | Malic Acid (60%) | Tartaric Acid |
| Grapefruit | Citric Acid | Malic Acid |
| Guava | Citric Acid | Malic Acid |
| Lime, Lemon | Citric Acid | Malic Acid |
| Mango | Citric Acid | Malic Acid, Tartaric Acid |
| Orange | Citric Acid | Malic Acid |

---

[8] Y.H. Hui, et al., Handbook of Fruit and Vegetable Flavors, p. 693 (2010).

| | | |
|---|---|---|
| Peach | Malic Acid (73%) | Citric Acid |
| Pear | Malic Acid (77%) | Citric Acid |
| Pineapple | Citric Acid | Malic Acid |
| Pomegranate | Malic Acid (>50%) | Citric Acid (>22%) |
| Raspberry | Citric Acid | Malic Acid, Tartaric Acid |
| Strawberry | Citric Acid | Malic Acid, Tartaric Acid |
| Tamarind | Tartaric Acid | Citric Acid, Malic Acid |
| Watermelon | Malic Acid (99%) | Fumaric Acid |

34.    In berries such as blackberries, blueberries, raspberries and strawberries, malic acid is the second most significant fruit acid.

35.    In pomegranates, cherries, and tropical cherries (acerola), malic acid is the most significant fruit acid.

36.    Malic acid contributes and enhances the fruity, sweet and sour taste of these and other fruits.

## IV.    CHEMICAL STRUCTURE OF MALIC ACID

37.    Malic acid (molecular formula $C_4H_6O_5$) is the common name for 1-hydroxy-1, 2-ethanedicarboxylic acid.

38.    Malic acid has two isomers, or different arrangements of atoms in the molecule, L-malic acid, and D-malic acid. 21 C.F.R. § 184.1069.

39.    An isomer is a molecule sharing the same atomic make-up as another but differing in structural arrangements.

40.    Stereoisomers contain different types of isomers, each with distinct characteristics that separate each other as different chemical entities with different chemical properties.

41.     Stereoisomers differ from each other by spatial arrangement, meaning different atomic particles and molecules are situated differently in any three-dimensional direction by even one degree.

42.     An enantiomer is a type of stereoisomer that is a mirror-image and cannot be superimposed.

43.     Enantiomers are like right and left-hand versions of the same molecular formula.

44.     D-Malic Acid and L-Malic Acid are enantiomers.

45.     Below are skeletal formulas of the enantiomers D-Malic Acid and L-Malic Acid.



46.     L-malic acid occurs naturally in various fruits and is known for providing sweetness and tartness, among other flavors.

47.     D-Malic Acid does not occur naturally.

48.     D-Malic Acid is most commonly found as a racemic mixture of the D isomer and L isomer, DL-Malic Acid, which is commercially made from petroleum products.

## V.   ADDITION OF DL-MALIC ACID

49.   Adding DL-Malic Acid to a solution of natural flavorings containing L-Malic Acid changes the concentration of malic acid in the solution and the ratio of total malic acid to sugars in that solution.

50.   Natural sugars – like glucose, fructose, and sucrose – combined with artificial DL-Malic Acid in a ratio engineered to resemble the natural chemical combination of sugar and L-Malic Acid found in the characterizing fruit flavors of the Product is not equivalent to the natural flavor of those characterizing fruits and flavors.

51.   A natural chemical combination of sugar and L-Malic Acid, altered by adding artificial DL-Malic Acid, is no longer equivalent to the original chemical combination of sugar and L-Malic Acid, and is therefore no longer the natural flavor of those fruits.

52.   Defendant includes DL-Malic Acid to help make the Products taste like the fruits featured on the Product labels natural taste.

53.   Defendant adds artificial DL-Malic Acid to the Products to create, enhance, simulate, and/or reinforce the sweet, fruity, and tart like taste that consumers associate with the fruits featured on the Product labels.

54.   Defendant had the option to add naturally extracted L-Malic Acid or natural fruit flavors but instead used artificial DL-Malic Acid because it cost less or more accurately resembled the flavors of the fruits featured on the Product labels than other ingredients.

55.   DL-Malic Acid is synthetically produced from petroleum in a high-pressure, high-temperature, catalytic process.

56.   Since there are natural and artificial types of malic acid, laboratory analysis is

necessary to identify which type was used in the Products.

57.   Laboratory analysis concluded the Products contain artificial, DL-Malic Acid, instead of the natural, L-Malic Acid.

## VI.   REQUIREMENTS FOR LABELING

58.   Federal and identical state regulations prohibit false and deceptive identification of the source of a food or beverage's characterizing flavors.

59.   Federal regulations define an artificial flavor as "any substance, the function of which is to impart flavor, which is not derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, fish, poultry, eggs, dairy products, or fermentation products thereof." 21 C.F.R § 101.22(a)(1).

60.   Natural flavor is defined as "essential oil, oleoresin, essence or extractive, protein hydrolysate, distillate, or any product of roasting, heating or enzymolysis, which contains the flavoring constituents" from fruits or vegetables, "whose significant function in food is flavoring rather than nutritional." 21 C.F.R § 101.22(a)(3).

61.   DL-Malic Acid is not a "natural flavor" as this term is defined by federal and state regulations and is not derived from a fruit or vegetable or any other natural source.

62.   A combination of sugar and DL-Malic Acid in a ratio resembling a fruit flavor cannot be derived from a fruit or vegetable.

63.   A mixture of sugar, natural L-Malic Acid, and artificial DL-Malic Acid combined in a way to resemble the natural ratio of sugar and L-Malic Acid found in the natural flavors of the Products cannot be derived from a fruit or vegetable.

64.   A combination of sugars and artificial DL-Malic Acid engineered to resemble the

10

natural ratio of sugars and natural L-Malic Acid that make up the natural flavor of the fruits in the Products is not a natural flavor.

65.     The natural flavor of the fruits in controversy is heavily dependent on a specific ratio of sugar and L-Malic Acid, while the Products' flavors depend upon a ratio of sugar and DL-Malic Acid.

66.     DL-Malic Acid could function as a flavor enhancer or PH balancer.

67.     A flavor enhancer is "added to supplement, enhance, or modify the original taste and or aroma of a food without imparting a characteristic taste or aroma of its own." 21 C.F.R. § 170.3(o)(11).

68.     For example, malic acid added to vinegar (ascetic acid) dishes like barbecue pork, coleslaw, or pickled eggs would most likely not fundamentally alter the underlying vinegar flavors.

69.     However, because the flavor imparted by malic acid is a core component of the Products' characterizing fruit flavors, DL-Malic Acid does not function as a flavor enhancer.

70.     Under these circumstances, artificial DL-Malic Acid fundamentally alters the original combination of sugar and natural L-Malic Acid so that the characterizing fruit flavors of the Products are no longer a natural ratio of sugar and L-Malic Acid but instead are an artificial ratio of sugar and DL-Malic Acid.

71.     PH balancers are "substances added to change or maintain active acidity or basicity, including buffers, acids, alkalis, and neutralizing agents." 21 C.F.R. § 170.3(o)(23).

72.     The malic acid used in the Products is not a PH balancer because it is not necessary to change or maintain active acidity or basicity.

73.     Irrespective of the purpose Defendant may claim DL-Malic Acid was added to the

11

Product, it has the same effect on its characterizing fruit flavors.

74.    Defendant does not have the ability to command DL-Malic Acid to only perform certain functions and cannot decide which malic acid constitutes flavor and which malic acid constitutes only a flavor enhancer or PH balancer.

75.    The labels on Defendants' Products state that they are fruit flavored Products which is to be considered the characterizing flavor identified on the Products' front labels. 21 C.F.R. § 101.22.

76.    Federal and state regulations require the Products to disclose whether the characterizing flavors are from fruits, other natural sources, and/or from artificial or chemical sources, such as DL-Malic Acid, from petroleum. 21 C.F.R. § 101.22(i).

77.    Since the Products contain an artificial flavor, DL-Malic Acid, that simulates, resembles, and reinforces the characterizing flavors, federal regulations require that the name of the characterizing flavors "shall be accompanied by the word(s) 'artificial' or 'artificially flavored,'" such as "Artificial Berry Pomegranate Flavor" and "Artificial Tropical Cherry Flavor." 21 C.F.R. § 101.22(i)(2).

78.    The statements, "Natural Flavor With Other Natural Flavor," are misleading based on the presence of the artificial flavoring ingredient DL-Malic Acid in the Products.

79.    Defendant's claims that the Product's contain solely "Natural Flavor With Other Natural Flavor," and omission of any reference to artificial flavor on the front labeling and ingredient list misleads consumers like Plaintiff to expect only natural flavors in the Products.

80.    Consumers are unable to discern if the malic acid listed in the ingredients is the artificial version without a chemistry kit.

81.   Defendant is required to inform consumers if the Products contain the artificial version of malic acid, instead of merely providing its generic name.

82.   The Products' characterizing fruit flavors containing DL-Malic Acid resemble the natural taste of those fruits.

83.   Plaintiff purchased the Products because the packaging claimed they solely contained "Natural Flavor With Other Natural Flavor" to provide their characterizing fruit taste, which she understood as meaning the flavor was only from natural, and not artificial flavoring ingredients.

84.   Plaintiff would not have been able to understand that the statement, "Natural Flavor With Other Natural Flavor," was not true and was misleading, without an advanced understanding of organic chemistry and without performing chemical analysis on the Products.

85.   Plaintiff was unaware that the Products contained artificial DL-Malic Acid when she purchased them, and that this synthetic ingredient affected their characterizing flavors.

86.   Plaintiff was deceived into paying money for products she did not want, or worth less than what Plaintiff paid for them, because the Products were labeled with "Natural Flavor With Other Natural Flavor," which she understood to mean their taste was provided only by natural, and not artificial flavoring ingredients.

87.   Worse than the lost money, Plaintiff was deprived of her protected interest to choose the foods and ingredients she ingests.

88.   Plaintiff is not, and should not be required, to chemically test the food products she purchases to know their true contents.

89.   Defendant, and not Plaintiff, knew or should have known that the statements, "Natural Flavor With Other Natural Flavor," was false, deceptive, and misleading, and that

13

Plaintiff would not be able to ascertain the Products contained artificial DL- Malic Acid unless Defendant expressly told her, as required by law.

90.    Defendant employs professional chemists to create the chemical flavor formulas of the Products.

91.    Therefore, Defendant through its employees, knew or should have known that DL-Malic Acid is not naturally occurring, and that by adding DL-Malic Acid to the Products, the natural flavorings, if any were ever actually added, would be fundamentally changed.

92.    Defendant knew that DL-Malic Acid would contribute and/or enhance the tart and fruity tastes in the Products.

93.     Defendant through their employees did know that DL- Malic Acid was not naturally occurring and would fundamentally alter any natural combination of sugar and L-Malic Acid in the Products but chose to include DL-Malic Acid because it costs less than using natural L-Malic Acid and because it did not believe reasonable consumers would know the difference.

## VII.  CONCLUSION

94.    Defendant makes other representations and omissions with respect to the Products which are false or misleading.

95.    Reasonable consumers must and do rely on a company to honestly identify and describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

96.    The value of the Products that Plaintiff purchased was materially less than the value as represented by Defendant.

97.    Defendant sold more of the Products and at higher prices than it would have in the

absence of this misconduct, resulting in additional profits at the expense of consumers.

98.   Had Plaintiff and proposed class members known the truth, they would not have bought the Products or would have paid less for them.

99.   As a result of the false and misleading representations, the Products are sold at a premium price, approximately no less than no less than $3.27 for 1.62 oz, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than they would be sold for absent the misleading representations and omissions.

Jurisdiction and Venue

100.   Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

101.   The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

102.   Plaintiff Sandra Adams is a citizen of Florida.

103.   Defendant The Kraft Heinz Company is a Delaware corporation with a principal place of business in Pittsburgh, Allegheny County, Pennsylvania.

104.   The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen.

105.   The members of the class Plaintiff seeks to represent are more than 100 because the Products have been sold for several years, in thousands of locations, in the states covered by Plaintiff's proposed classes.

106.   The Products are available to consumers from third-party grocery stores, warehouse club stores, drug stores, convenience stores, big box stores, and online.

107.   Venue in this District is proper because a substantial part of the events or omissions giving rise to these claims occurred in Lake County, i.e., Plaintiff's purchase and use of the Products and her awareness and/or experiences with the issues described herein.

Parties

108.   Plaintiff Sandra Adams is a citizen of Groveland, Lake County, Florida.

109.   Defendant Kraft Heinz Food Company is a Pennsylvania limited liability corporation with a principal place of business in Pittsburgh, Pennsylvania, Allegheny County.

110.   Defendant's predecessor, the Kraft Corporation, was started in 1903 through the sale of cheese door-to-door in Chicago.

111.   Within twenty years, Kraft had become the largest cheese manufacturer in the world.

112.   Over the next century, Kraft would become one of the largest food and beverage companies in the world, and own some of the most iconic brands, like Oscar Mayer and Jell-O.

113.   Kraft was one of the first companies to directly advertise to consumers, not only through color print ads but also on television and radio.

114.   Kraft sponsored television and radio shows, which created goodwill and trust among consumers.

115.   Kraft is considered to be one of America's most trusted brands.

116.   The MiO Product line was designed as a modern and convenient alternative to beverage powders, which would add flavor to water.

117.   Defendant developed and heavily marketed MiO to capitalize on the tens of billions of dollars spent annually on water by consumers.

118.   Defendant knew that consumers like Plaintiff were seeking to avoid sugary

16

beverages and artificial flavors, and consuming more water.

119.  The Products are available to consumers from third-party grocery stores, warehouse club stores, drug stores, convenience stores, big box stores, and online.

120.  Plaintiff purchased the Products on one or more occasions within the statutes of limitations for each cause of action alleged, at stores including Walmart, at locations including 1450 Johns Lake Rd, Clermont, FL 34711 between 2020 and 2022, and/or among other times.

121.  Plaintiff believed the Products contained only natural flavoring ingredients and did not contain artificial flavoring ingredients.

122.  Plaintiff bought the Products because she expected they contained only natural flavoring ingredients and did not contain artificial flavoring ingredients because that is what the Products' representations said and implied.

123.  Plaintiff relied on the words, coloring, descriptions, layout, packaging, tags, and/or images on the Products, on the labeling, statements, omissions, and/or claims made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Products and separately, through in-store, digital, audio, and print marketing.

124.  Plaintiff was deceived because she believed the Products contained only natural flavoring ingredients and did not contain artificial flavoring ingredients.

125.  Plaintiff bought the Products at or exceeding the above-referenced price.

126.  Plaintiff would not have purchased the Products if she knew the representations and omissions were false and misleading or would have paid less for them.

127.  Plaintiff chose between Defendant's Products and products represented similarly, but which did not misrepresent their attributes, features, and/or components.

17

128. The Products were worth less than what Plaintiff paid for them and she would not have paid as much absent Defendant's false and misleading statements and omissions.

129. Plaintiff intends to, seeks to, and will purchase the Products again when she can do so with the assurance the Products' representations are consistent with its abilities, attributes, and/or composition.

130. Plaintiff is unable to rely on the labeling and representations not only of these Products, but for other similar water enhancers, because she is unsure whether those representations are truthful.

Class Allegations

131. Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Florida Class:** All persons in the State of Florida who purchased the Products during the statutes of limitations for each cause of action alleged; and

> **Consumer Fraud Multi-State Class**: All persons in the States of Alabama, South Carolina, Tennessee, and Virginia who purchased the Products during the statutes of limitations for each cause of action alleged.

132. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

133. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

134. Plaintiff is an adequate representative because her interests do not conflict with other members.

135.   No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

136.   Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

137.   Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

138.   Plaintiff seeks class-wide injunctive relief because the practices continue.

<u>Florida Deceptive and Unfair Trade Practices Act</u>
<u>("FDUTPA"), Fla. Stat. § 501.201 et seq.</u>
<u>(Consumer Protection Statute)</u>

139.   Plaintiff incorporates by reference all preceding paragraphs.

140.   Plaintiff and class members desired to purchase products that contained only natural flavoring ingredients and did not contain artificial flavoring ingredients.

141.   Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

142.   Defendant misrepresented the Products through statements, omissions, ambiguities, half-truths and/or actions.

143.   Plaintiff relied on the representations that the Products contained only natural flavoring ingredients and did not contain artificial flavoring ingredients.

144.   Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

19

<u>Violation of State Consumer Fraud Acts</u>
<u>(On Behalf of the Consumer Fraud Multi-State Class)</u>

145.  Plaintiff incorporates by reference all preceding paragraphs.

146.  The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the above-referenced consumer protection statute and prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

147.  The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

148.  Defendant intended that each of the members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

149.  As a result of Defendant's use or employment of artifice, unfair or deceptive acts or business practices, each of the members of the Consumer Fraud Multi-State Class have sustained damages in an amount to be proven at trial.

150.  Defendant's conduct showed motive and a reckless disregard of the truth such that an award of punitive damages is appropriate.

<u>Breaches of Express Warranty,</u>
<u>Implied Warranty of Merchantability/Fitness for a Particular Purpose and</u>
<u>Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.</u>

151.  Plaintiff incorporates by reference all preceding paragraphs.

152.  The Products were manufactured, identified, and sold by Defendant and expressly and impliedly warranted to Plaintiff and class members that they contained only natural flavoring

20

ingredients and did not contain artificial flavoring ingredients.

153.  Defendant directly marketed the Products to Plaintiff and consumers through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, and targeted digital advertising.

154.  Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

155.  Defendant's representations about the Products were conveyed in writing and promised they would be defect-free, and Plaintiff understood this meant the Products contained only natural flavoring ingredients and did not contain artificial flavoring ingredients.

156.  Defendant's representations affirmed and promised that the Products contained only natural flavoring ingredients and did not contain artificial flavoring ingredients.

157.  Defendant described the Products as ones which contained only natural flavoring ingredients and did not contain artificial flavoring ingredients, which became part of the basis of the bargain that the Products would conform to their affirmations and promises.

158.  Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Products.

159.  This duty is based on Defendant's outsized roles in the market for these types of Products, as trusted company known for its high-quality products.

160.  Plaintiff recently became aware of Defendant's breach of the Products' warranties.

161.  Plaintiff provided or will provide notice to Defendant, its agents, representatives, retailers, and their employees.

162.  Plaintiff hereby provides notice to Defendant that it breached the express and implied

warranties associated with the Products.

163.   Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

164.   The Products did not conform to their affirmations of fact and promises due to Defendant's actions.

165.   The Products were not merchantable because they were not fit to pass in the trade as advertised, not fit for the ordinary purpose for which they were intended and did not conform to the promises or affirmations of fact made on the packaging, container or label, because they were marketed as if they contained only natural flavoring ingredients and did not contain artificial flavoring ingredients.

166.   The Products were not merchantable because Defendant had reason to know the particular purpose for which the Products were bought by Plaintiff, because she expected they contained only natural flavoring ingredients and did not contain artificial flavoring ingredients, and she relied on Defendant's skill and judgment to select or furnish such suitable products.

167.   Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

<u>Negligent Misrepresentation</u>

168.   Plaintiff incorporates by reference all preceding paragraphs.

169.   Defendant had a duty to truthfully represent the Products, which it breached.

170.   This duty was non-delegable, and based on Defendant's positions, holding itself out as having special knowledge and experience in this area, a trusted company known for its high-

quality products.

171.   Defendant's representations regarding the Products went beyond the specific representations on the packaging, as they incorporated the extra-labeling promises and commitments to quality, transparency and putting customers first, that it has been known for.

172.   These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

173.   The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

174.   Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Products.

175.   Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

<u>Fraud</u>

176.   Plaintiff incorporates by reference all preceding paragraphs.

177.   Defendant misrepresented and/or omitted the attributes and qualities of the Products, that they contained only natural flavoring ingredients and did not contain artificial flavoring ingredients.

178.   Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity or deception, through statement and omission, of the representations.

179.   Defendant knew of the issues described here yet did not address them.

23

180.   Defendant's fraudulent intent is evinced by its knowledge that the Products were not consistent with their representations.

Unjust Enrichment

181.   Plaintiff incorporates by reference all preceding paragraphs.

182.   Defendant obtained benefits and monies because the Products were not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

6.  Other and further relief as the Court deems just and proper.

Dated:   June 24, 2022

Respectfully submitted,

/s/Alexander J. Korolinsky
Alexander J. Korolinsky, Esq.
Florida Bar No.: 119327
AJK LEGAL
1001 Brickell Bay Dr Ste 2700
Miami FL 33401
Tel: (877) 448-8404
korolinsky@ajklegal.com

SHEEHAN & ASSOCIATES, P.C.
Spencer Sheehan*
60 Cuttermill Rd Ste 412
Great Neck NY 11021
Tel: (516) 268-7080
spencer@spencersheehan.com

*Pro Hac Vice Application Forthcoming
